Filed 1/25/24  Aegis Asset Management v. CBRE CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| AEGIS ASSET MANAGEMENT LLC,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CBRE INC. et al.,<br><br>        Defendants and Respondents. | A165148, A165153, A165331<br><br>(San Francisco County Super. Ct. No. CGC19580448) |

Aegis Asset Management, LLC ("Aegis") alleges it was lured on false pretenses into expending substantial resources to participate in competitive bidding for the purchase of a commercial building located in downtown San Francisco, only to be thwarted at the last minute when, the day before the ostensible deadline for bid submissions, the seller accepted an offer from another buyer.  Aegis alleges the competitive bidding was a deceptive scam, the seller never intended to sell the property through competitive bidding, and it was duped into participating in the charade as a pawn just so the seller could generate time pressure and leverage to extract a higher price from the buyer, whom the seller had favored all along for business reasons.

Aegis sued the seller, the seller's commercial real estate broker and the buyer, asserting multiple causes of action sounding in contract and tort.  The trial court sustained several rounds of demurrers to all causes of action,

1

finally doing so without leave to amend, and Aegis appeals the resulting judgments of dismissal.

We conclude the trial court did not err in sustaining demurrers to the contract claims Aegis asserted against the seller and its real estate broker, but it erred in sustaining demurrers to the causes of action Aegis pled against them for promissory estoppel and fraud. Accordingly, we will reverse the judgments entered in their favor. We will affirm the judgment of dismissal entered in favor of the buyer.

## BACKGROUND

### A.

Our recitation of the facts is based upon the standard governing our review of an order sustaining a demurrer, which requires us to "accept as true all material facts properly pled and matters which may be judicially noticed but disregard contentions, deductions or conclusions of fact or law." (*290 Division (EAT), LLC v. City and County of San Francisco* (2022) 86 Cal.App.5th 439, 450 (*290 Division (EAT)*).)

### B.

Aegis is a real estate investment company based in Buffalo, New York.

According to the allegations of the operative complaint (the Third Amended Complaint), on September 24, 2019, CBRE, Inc. ("CBRE"), which had been engaged as the commercial real estate agent for CIM Group, L.P. ("CIM"), informed Aegis's real estate advisor and broker, Newmark Knight Frank ("NKF"), that CIM would be selling an office building it owned, located at One Tehama Street in San Francisco, through a competitive bidding process and sent NKF an Investment Summary regarding the property.

Over the next two weeks, the brokers remained in frequent contact with each other. During their communications, CBRE told NFK that CIM

2

had decided to solicit written competitive bids from prospective bidders and to close the bidding at 5:00 p.m. on Thursday, October 10, 2019, and solicited a bid from Aegis. Meanwhile, NFK prepared a preliminary valuation analysis for CIM.

Aegis alleges that CIM, through its agent CBRE, reached an oral agreement to accept a bid from Aegis any time before the close of bidding as part of a competitive bidding process, provided that Aegis would evaluate the property and, absent any unforeseen *force-majeure* events (i.e., Acts of God), submit a timely bid. The agreement was proposed by CIM and accepted by Aegis during telephone conversations between their real estate brokers that took place between September 24 and October 5, 2019. The terms to which they allegedly agreed were that CIM would produce "written documents" about the property and CBRE would furnish them to all prospective bidders before the close of initial bidding; Aegis would evaluate the property and submit an initial bid to CBRE by 5:00 p.m. on Thursday, October 10, 2019; CBRE would relay the bid to CIM; after the close of the initial bidding, CIM and CBRE would jointly narrow the field to the two parties who submitted the highest initial bids; CBRE would supply the two final bidders additional written documents; each of the two final bidders would have an opportunity to review the additional documents and make another offer to buy the property at a specified price; their two final bids would be relayed by CBRE to CIM; and the property would be sold to the one who offered the higher price.

Unbeknownst to Aegis, though, by the time Aegis had been led to believe it would be allowed to participate in competitive bidding, another potential buyer, Bell Sound USA LLC ("Bell Sound"), an entity with which CIM had a pre-existing business relationship, was completing its due

diligence review, including with the benefit of material documents and information about the property that CIM never provided to Aegis. Among those material documents not furnished to Aegis was a copy of the lease for the building's master commercial tenant. CIM was disposed favorably to Bell Sound and was motivated to sell the property to Bell Sound, even at a lower price, in order to do future business with Bell Sound.

In reliance on the oral agreement and CBRE's representations that there would be competitive bidding, Aegis expended substantial time and resources evaluating the property and preparing an initial bid. Two of its executives flew across the country to San Francisco and toured the property on October 7 with CBRE. During the property tour, CBRE gave Aegis an Offering Memorandum and again orally confirmed that all bids were due by 5:00 p.m. on October 10. Aegis informed CBRE that it was very interested in the building and intended to submit a bid, and early the next morning, on Wednesday, October 9, a third company executive flew to San Francisco to assist in preparing Aegis' bid and toured the property upon her arrival.

At 4:58 p.m. later that day, Wednesday, October 9, CBRE emailed Aegis' broker stating that "We wanted to reach out and let you know that we had an investor step up and go non-refundable prior to the bid date scheduled for tomorrow. [¶] We are letting everyone know prior to the bid date scheduled for tomorrow." When Aegis received the email from its broker, it was taken completely by surprise.

Bell Sound had made a $10 million *non-refundable* deposit, which defied both ordinary business judgment and standard real estate industry practice.

On October 18, 2109, before the sale closed, Aegis' lawyer wrote a letter demanding the opportunity to submit a bid, but no competitive bidding took

4

place and Bell Sound purchased the property for a lower price than Aegis would have bid had it been permitted to. Aegis was given no opportunity to submit a bid that might have matched or exceeded the terms of Bell Sound's offer. And neither CBRE nor CIM ever offered any explanation for breaking their promise to hold a competitive bidding process.

According to the allegations, both seller and buyer had acted intentionally. In order to generate pressure and close a transaction with Bell Sound, CIM had informed Bell Sound that other investors with ample resources were actively pursuing bidding on the property, including Aegis who had committed to participate in the competitive bidding. Bell Sound, upon being informed of this, had made an offer with a large non-refundable deposit in order to intentionally disrupt and cancel the competitive bidding process. CIM had never intended to carry out the competitive bidding, knew its promise to Aegis was false, and had concealed the fact it had purposely engaged in duplicity. CIM was allegedly willing to accept a potentially lower price from Bell Sound because CIM wanted to continue to do business with it. And Bell Sound, for its part, intentionally disrupted the competitive bidding process to obtain a lower price. It also proceeded to close the transaction knowing of the oral contract and knowing that Aegis's lawyer had written a letter of protest, demanding that Aegis be given an opportunity to bid.

CIM's broker, CBRE, had joint decision-making authority with CIM concerning all aspects of the sale, including whether to sell the property to any given buyer at a given price and how to conduct the sale, was allegedly a party to the oral agreement and also allegedly acted as both an agent and a joint venturer in the sale of the property.

5

246 First Street, (SF) Owner, LLC ("246 First Street") was allegedly the agent of both and assisted them in perpetuating their wrongdoing. 246 First Street was also alleged to be an owner of the property along with CIM.

Aegis sued CIM, 246 First Street, CBRE and Bell Sound asserting eleven causes of action.[1] They were for: specific performance of contract (first cause of action), fraud (second cause of action), breach of oral contract (third cause of action), breach of implied-in-fact contract and/or part oral and part implied contract (fourth cause of action), promissory estoppel (fifth cause of action), breach of the covenant of good faith and fair dealing (sixth cause of action), unjust enrichment/quantum meruit (seventh cause of action), intentional interference with contractual relations (eighth cause of action), declaratory relief (ninth cause of action), injunctive relief (tenth cause of action) and constructive trust (eleventh cause of action).

The initial pleading (a First Amended Complaint) identified only CIM and CBRE as named defendants. They filed demurrers, which the trial court sustained with leave to amend. Aegis amended its complaint (filing a Second Amended Complaint) in which it identified Bell Sound as a named defendant, previously sued as Doe 1. All named defendants filed demurrers to the Second Amended Complaint, which the trial court again sustained with leave to amend. Aegis then filed a Third Amended Complaint (its operative complaint). Defendants again demurred to all eleven causes of action, and the trial court sustained the demurrers without leave to amend. Judgments of dismissal were entered, and these timely appeals followed. On our own motion, we consolidated the appeals for purposes of argument and decision.

---

[1] None of the parties have distinguished between CIM and 246 First Street for any purpose, and all subsequent references to "CIM" are to both entities.

## DISCUSSION

Aegis challenges the dismissal of all of its claims against all defendants.

" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146.) "Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) "It is not this court's role to construct arguments that would undermine the lower court's judgment and defeat the presumption of correctness." (*Needelman v. DeWolf Realty Co., Inc.* (2015) 239 Cal.App.4th 750, 762.) "Issues not supported by argument or citation to authority are forfeited." (*Ibid.*)

## I.

### *Standard of Review*

"A judgment based on an order sustaining a general demurrer must be affirmed if any one of the several grounds of demurrer is well taken." (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 21.)

On appeal, " '[t]he plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action. [Citation.] We will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the

7

defendant asserted a proper ground in the trial court proceedings.' " *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1490-1491 (*Rossberg*)).

We review the court's judgment independently. (*Thomas v. Regents of University of California* (2023) 97 Cal.App.5th 587 [2023 WL 8248249, at p. *4].) We accept the truth of all material factual allegations of the complaint and disregard all contentions or conclusions of law. (*Ibid*.) Furthermore, the complaint must be liberally construed " 'with a view to substantial justice between the parties.' " (*Ibid*.) " 'If the complaint states a cause of action under any theory, regardless of the title under which the factual basis for relief is stated, that aspect of the complaint is good against a demurrer.' " (*Ibid*.)

"When a demurrer is sustained without leave to amend, we also must decide whether there is a reasonable possibility that the defect can be cured by amendment." (*Koszdin v. State Comp. Ins. Fund* (2010) 186 Cal.App.4th 480, 487.) " 'The plaintiff bears the burden of proving there is a reasonable possibility of amendment. [Citation.] . . . [¶] To satisfy that burden on appeal, a plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading." [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] The plaintiff must clearly and specifically set forth the "applicable substantive law" [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.] Allegations must be factual and specific, not vague or conclusionary.' " (*Rossberg*, 219 Cal.App.4th at p. 1491.)

8

## II.
### *Contract Claims Against CIM and CBRE*
### *(Third, Fourth and Sixth Causes of Action)*

The third, fourth and sixth causes of action, brought against CIM and CBRE, sound in contract. The third cause of action is for breach of oral contract; the fourth cause of action is for breach of an "implied-in-fact contract and/or part-oral-and-part-implied-contract," which is pled in the alternative to the oral contract cause of action "if it is determined that there was no [o]ral [a]greement"; and the sixth cause of action is for breach of the covenant of good faith and fair dealing.

CIM demurred to these three causes of action on the ground, among others, that they are barred by the statute of frauds. CBRE also raised the statute of frauds on demurrer, albeit in a footnote.[2]

Where a contract is governed by the statute of frauds, it must be evidenced by a writing signed by the party against whom the contract is

---

[2] This was sufficient to preserve the issue for our review, contrary to Aegis' contention CBRE has forfeited the point. " 'The critical point for preservation of claims on appeal is that the asserted [issue] must have been brought to the attention of the trial court.' " (*Dacey v. Taraday* (2011) 196 Cal.App.4th 962, 978.) Here, it was. The footnote states, citing authority, "To the extent that the alleged [o]ral [a]greement contemplated a potential transfer of ownership rights of the Property, such an [o]ral [a]greement would fail to satisfy the Statute of Frauds."

Even if CBRE had forfeited this issue, we would exercise our discretion to decide it. It presents a pure legal question on review of the court's demurrer ruling, the trial court was squarely presented with the issue in connection with CIM's demurrer, and all parties have addressed the merits of this issue on appeal. No point would be served by deferring its consideration. As noted, we will affirm the ruling on CBRE's demurrer if there is any ground on which to do so, " 'whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings.' " (*Rossberg, supra,* 219 Cal.App.4th at p. 1491.)

9

sought to be enforced. (*Sterling v. Taylor* (2007) 40 Cal.4th 757, 761, 765-766 (*Sterling*).) The doctrine serves an evidentiary function. (*Id.* at p. 766.) Its purpose is " 'to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made.' " (*Ibid.*) Here, the Third Amended Complaint alleges that the parties' oral competitive bidding agreement is memorialized in writing by CBRE's October 9 email informing Aegis that another investor had "step[ped] up and go[ne] non-refundable prior to the bid date scheduled for tomorrow."[3]

On appeal, Aegis contends these causes of action are not barred by the statute of frauds for four reasons. We disagree with its arguments and conclude both demurrers were properly sustained on this basis.[4]

## A. The Alleged Contract Is Subject to the Statute of Frauds.

Aegis first argues that the statute of frauds does not apply to this type of contract, i.e., the alleged competitive bidding contract. We reject that

---

[3] Specifically, it alleges: "even mistakenly assuming that the statute of frauds defense could otherwise apply here, nonetheless the statute of frauds would be satisfied by the October 9, 2019 email (a copy of which is attached hereto as Exhibit A) which memorialized (in writing) the existence of the [o]ral [a]greement."

[4] Although the fourth cause of action for breach of an implied-in-fact contract was pled *in the alternative* to the existence of an enforceable oral contract, the parties assume, without addressing the issue, that the statute of frauds applies to that cause of action. Therefore, we will do the same.

Further, Aegis advances no legal argument concerning that cause of action apart from the statute of frauds, and so it warrants no further discussion. (See *Needelman v. DeWolf Realty Co., Inc.*, *supra*, 239 Cal.App.4th at p. 762 ["[W]hen the appellant fails to support an issue with pertinent or cognizable argument, 'it may be deemed abandoned and discussion by the reviewing court is unnecessary' "].)

10

argument because Aegis has failed to present a cognizable appellate argument.

Aegis does not explain what the law is on this subject, much less demonstrate how it applies here. It does not even cite or discuss any of the statutes encompassing the statute of frauds. (See Civ. Code, § 1624; Code Civ. Proc., §§ 1091, 1971.) Instead, in its appeal from the judgment in favor of CIM, Aegis simply distinguishes cases CIM cited in the trial court and asserts generally, in a vacuum, that the statute of frauds must be narrowly construed. In its appeal from the judgment in favor of CBRE, it does not even address the merits of this issue in its opening brief; and in its reply brief just asserts (inaccurately) that in its opening brief it already distinguished the authorities relied upon by CBRE, repeats the same "narrow construction" principle, and accuses CBRE of "ignoring" a dense string citation to legal authority that it contends it cited below in its opposition to one of the demurrers but does not explain or make any attempt to analyze, which is doubly improper (see *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 804, fn. 37 [string citations]; *In re S.C.* (2006) 138 Cal.App.4th 396, 412 [same]; *Doe v. McLaughlin* (2022) 83 Cal.App.5th 640, 654 [arguments incorporated by reference from trial court briefing].)

To meet its burden as the appellant, Aegis must affirmatively demonstrate that an oral agreement of this sort—i.e., a contract to offer real property for sale by means of a contractually agreed upon procedure (i.e., a competitive bidding process)—is *not* subject to the statute of frauds. But it has made no attempt to show that by means of a reasoned legal argument. That question is completely unaddressed in its briefing.

11

Furthermore, Aegis' unexplained position that the statute of frauds does not apply to the alleged agreement is inconsistent with both statute and binding California Supreme Court case law.

Under Code of Civil Procedure section 1971, no "power over or concerning" an interest in real property "or in any manner relating thereto, can be . . . surrendered" unless by means of an "instrument in writing, subscribed by the party . . . surrendering . . . the same" or by their agent.[5] (Code Civ. Proc., § 1971.)  So, for example, an agreement that limits the *use* of real property is governed by the statute of frauds.  (See *Triangle Ranch, Inc. v. Union Oil Co. of California* (1955) 135 Cal.App.2d 428, 438-439 [oral agreement restricting oil production].)

So too is an agreement that constricts the right of *sale*.  CIM and CBRE both cite the Supreme Court's decision in *In re Baglione's Estate* (1966) 65 Cal.2d 192 which announced the principle that "[a]greements restricting the right to alienate real property . . . are within the statute of frauds." (*Id.* at p. 197 [citing, inter alia, Code Civ. Proc., § 1971]; accord, *Pellerito v. Dragna* (1940) 41 Cal.App.2d 85, 89 ["an oral agreement restricting the right of the owner of land to alienate it is an agreement affecting one's title to real estate and within the statute of frauds"].)

The oral contract alleged here restricted CIM's right to sell the property.  As CIM puts it, "[t]he entire premise of Appellant's contract-based

---

[5] In full, it states:  "No estate or interest in real property, other than for leases for a term not exceeding one year, nor any power over or concerning it, or in any manner relating thereto, can be created, granted, assigned, surrendered, or declared, otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating, granting, assigning, surrendering, or declaring the same, or by the party's lawful agent thereunto authorized by writing."  (Code Civ. Proc., § 1971.)

12

claims is that Respondents were not permitted to sell the Building without a so-called 'competitive bidding process.'" Or, put another way, the alleged oral contract *required* CIM to sell the property to one of two highest competitive bidders. Aegis does not address this point nor the Supreme Court's decision in *In re Baglione's Estate.* We agree with CIM and CBRE that the oral contract is subject to the statute of frauds for this reason.[6]

A separate reason, not focused on by the parties, is because "an oral agreement to make a contract which must be in writing, is itself within the statute of frauds." (*Paul v. Layne & Bowler Corp.* (1937) 9 Cal.2d 561, 564.) Here, the alleged oral agreement about competitive bidding required CIM to make a contract to sell the property to one of two highest bidders.[7] And that ultimate transaction would itself be subject to the statute of frauds: as Aegis implicitly concedes, the statute of frauds applies to a contract to *sell* real property. (See Civ. Code, § 1624, subd. (a)(3); Code Civ. Proc., § 1091.) Thus, the oral agreement *requiring* CIM to make a contract to sell the property to the highest bidder was itself within the statute of frauds.

For these reasons, we reject Aegis' contention that the statute of frauds is inapplicable.

---

[6] CIM and CBRE also analogize to caselaw concerning options to sell real property and rights of first refusal, which fall under the rule that contracts "for the sale of real property, *or of an interest* therein" are governed by the statute of frauds. (Civ. Code, § 1624, subd. (a)(3), italics added.) We do not reach the issue whether the alleged oral agreement constitutes such a contract, because application of the statute of frauds may be resolved on the more straightforward grounds discussed in the text.

[7] Paragraph 31(i) of the Third Amended Complaint expressly alleges that "it was further agreed that, after the close of initial bidding, the Property would be sold to the party (among the Final Two Bidders) that submitted the higher purchase price."

## B. Disposition of This Issue on Demurrer

Second, Aegis argues that even if the oral contract is governed by the statute of frauds, the question whether the contract claims are barred by the statute of frauds cannot be decided on demurrer because the statute of frauds is an affirmative defense for which defendants bear the burden of proof, and the complaint does not affirmatively allege facts demonstrating the absence of a sufficient writing as a matter of law.

The parties agree that " '[a] demurrer based on an affirmative defense will be sustained only where the face of the complaint discloses that the action is necessarily barred by the defense.' " (*Brown v. Crandall* (2011) 198 Cal.App.4th 1, 10; accord, *Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183 ["A general demurrer will lie where the complaint 'has included allegations that *clearly* disclose some defense or bar to recovery' "].) They disagree as to whether that standard is met here.

Aegis argues that this standard is satisfied only if the complaint expressly concedes the *absence* of any note or memorandum that satisfies the statute of frauds, which the Third Amended Complaint does not do. But Aegis cites no authority supporting that assertion. Moreover, it is contrary to binding Supreme Court case law allowing the defense to be raised on demurrer when the alleged contract falls within the statute of frauds. (See *Harper v. Goldschmidt* (1909) 156 Cal. 245 (*Harper*) [demurrer properly sustained where alleged memorandum was insufficient because party to be charged did not sign it]; *Maynes v. Angeles Mesa Land Co.* (1938) 10 Cal.2d 587, 590 [demurrer held properly sustained; "If the original oral negotiations constituted the contract, the statute of frauds was a bar and could be raised by demurrer"] [per curiam].)

14

In *Harper*, plaintiff alleged that it entered into a contract to sell real property and that it was evidenced by a written memorandum with specifically alleged terms. (*Harper*, *supra*, 156 Cal. at p. 246.) The Supreme Court affirmed a judgment of dismissal after the sustaining of a demurrer because the plaintiff had not alleged that the buyer signed the memorandum. (*Id*. at pp. 252-253.) It held that the issue was properly decided on demurrer and explained that " 'Whenever it appears upon the face of the declaration, bill, or complaint, that the agreement sued upon is within the statute of frauds, and fails to comply with the requirements thereof, the appropriate mode of taking advantage of the defect is by demurrer.' " (*Ibid*.) The Supreme Court imposed no requirement that the plaintiff disclaim the existence of a sufficient written memorandum. (Accord, *Rossberg, supra,* 219 Cal.App.4th at p. 1503 ["[b]ecause the [plaintiffs] sought to allege a contract subject to the statute of frauds, they must allege a written contract signed by [defendant] and their failure to do so is a legal issue properly decided on demurrer"].)

Given the absence of any meaningful analysis by Aegis and this controlling authority, Aegis has failed to persuade us the trial court erred in considering the statute of frauds defense at the pleading stage. We also note the many cases CIM cites that assume, without deciding, that the defense may be raised on demurrer and uphold judgments sustaining demurrers based on the statute of frauds. (See *Reeder v. Specialized Loan Servicing LLC* (2020) 52 Cal.App.5th 795, 801-802 (*Reeder*); *Smyth v. Berman* (2019) 31 Cal.App.5th 183, 197 (*Smyth*); *Westside Estate Agency, Inc. v. Randall* (2016) 6 Cal.App.5th 317, 330; *Isaac v. A & B Loan Co.* (1988) 201 Cal.App.3d 307, 309.)

Relatedly, Aegis argues it is entitled to a legal presumption that a written note or memorandum that satisfies the statute of frauds exists. That proposition is at odds with the cases just discussed, where the issue was held properly resolved on demurrer. In support of this argument Aegis cites the principle that "in an action on a contract required by the statute of frauds to be in writing, the presumption is that the contract is in writing, and there is no necessity for an allegation in the complaint to that effect." (*Warfield v. Basso* (1923) 62 Cal.App. 47, 50.) But in the authority Aegis cites, the complaint did not allege whether the contract was written or oral. Here, the complaint affirmatively alleges it was oral. Aegis does not explain how the presumption of a written contract can trump those allegations.

## C. Sufficiency of a Writing

This brings us to Aegis' third argument, which is that the October 9 email satisfies the statute of frauds. Here again, Aegis' argument is undeveloped and conclusory. It cites the principle that "[a] memorandum functions only as evidence of the contract and need not contain every term" of a contract (*Kerner v. Hughes Tool Co.* (1976) 56 Cal.App.3d 924, 934 (*Kerner*)), but that statement taken out of context oversimplifies the law. *Kerner* acknowledges the memorandum must reflect a contract's *essential* terms. (See *id.* at p. 934 [letters that mention the "salient terms of the bargain" held sufficient; "Certainly the statute [of frauds] does not require more written terms than are required to make the contract itself"].)

Further, decades after *Kerner* was decided, the Supreme Court clarified what is required. In *Sterling*, not cited by Aegis in any of its opening briefs, the Court explained: "A memorandum satisfies the statute of frauds if it identifies the subject of the parties' agreement, shows that they made a contract, *and states the essential contract terms with reasonable certainty.*

16

[Citations.] 'Only the essential terms must be stated, " 'details or particulars' " need not [be]. *What is essential depends on the agreement and its context and also on the subsequent conduct of the parties . . . .'* [Citation.]" (*Sterling, supra,* 40 Cal.4th at p. 766, italics added.) Aegis does not acknowledge this legal standard much less explain how it applies here.

Furthermore, Aegis' characterization of the email tacitly concedes the email does not state all the contract's essential terms. In its appeal from the CIM judgment, Aegis asserts that "Reading the email properly with all inferences in Plaintiff's favor (i.e., the required liberal construction of the pleadings), the email set forth the essential terms that there was to be multi-party bidding with bids due on October 10, 2019." But the alleged oral agreement encompassed far more than just the seller's intention to entertain any bids submitted by a specified deadline—a fact that would not differentiate this sale from many other routine real estate transactions conducted in a competitive open market.[8] It encompassed an alleged agreement *by Aegis to evaluate the property and submit a bid.* And an agreement by the seller *to narrow the field to the two highest bidders.* And *a second round* of bidding. And *a promise to sell the property* to one of the two highest bidders. Aegis does not explain why those additional terms—or even just one of them—were not also essential. Indeed, the whole point of the alleged ruse was to dupe Aegis into preparing a competitive bid so that CIM could use its presence as a serious potential buyer as leverage. The gist of those factual allegations is that Aegis' agreement to participate in the

_____

[8] Aegis itself argues that "it is quite clear that this case does not merely involve [an] 'invitation to bid' but instead an agreement for a rule-based competitive bidding process, which involved mutual consideration . . . ." (Bold formatting omitted.)

bidding *is* an essential term of the parties' alleged contract.  Yet the October 9 email is silent on that subject.

Changing tack, Aegis argues for the first time in its reply brief in the appeal from CIM's judgment that the email's sufficiency cannot be decided on demurrer because, under *Sterling*, extrinsic evidence would be admissible to clarify its meaning.  It repeats the same argument in its later-filed reply brief in CBRE'S appeal.  This argument is forfeited.  (See *Herrera v. Doctors Medical Center of Modesto* (2021) 67 Cal.App.5th 538, 548 [" 'It is elementary that points raised for the first time in a reply brief are not considered by the court' "].)

It also is wrong.  "[W]hen ambiguous terms in a memorandum are disputed, extrinsic evidence is admissible to resolve the uncertainty." (*Sterling*, *supra*, 40 Cal.4th at p. 767.)  But "[b]ecause the memorandum itself must include the essential contractual terms, it is clear that extrinsic evidence cannot *supply* those required terms." (*Ibid*.)  It can be used only "to *explain* essential terms that were understood by the parties but would otherwise be unintelligible to others." (*Ibid*.)  In other words, only "if a memorandum includes the essential terms of the parties' agreement[] but the meaning of those terms is unclear" is extrinsic evidence relevant. (*Id*. at p. 771.)  Here, Aegis does not point to any term of the email that could even reasonably be construed to mean that Aegis was *required* participate in the bidding process, or that CIM was *required* to sell the property to one of two highest second round bidders, such that extrinsic evidence might clarify the email's intended meaning.  It just asserts that "[e]xtrinsic evidence could clarify the meaning of the terms 'we,' 'everyone' and 'bid date scheduled for tomorrow' " to prove that "the nature of the bidding was part of a competitive process (hence, the 'bid date') run by CBRE and [CIM] ('We'), among a pool of

18

bidders ('everyone')." This conclusory argument fails to persuade us that the existence of a competitive bidding process among a pool of bidders was the agreement's only essential term. Accordingly, Aegis has not demonstrated that parol evidence would be admissible to prove the meaning of the email.

## D. Equitable Estoppel

Finally, Aegis argues that the complaint alleges a basis to equitably estop CIM from asserting the statute of frauds, a claim that it characterizes as "merely a fallback on a fallback" position. We summarily reject this argument because it contains *no* discussion of the substantive law concerning equitable estoppel as applied to the statute of frauds, much less what is sufficient to invoke the doctrine at the pleading stage.

Further, the only authority Aegis cites involving equitable estoppel is *Byrne v. Laura* (1997) 52 Cal.App.4th 1054, which Aegis cites for the general proposition that application of the doctrine "is generally a question of fact." (*Id*. at p. 1068.) But "this argument overlooks that even factual issues may be resolved short of a trial where . . . they fail as a matter of law." (*Smyth, supra,* 31 Cal.App.5th at p. 199 [affirming order sustaining demurrer without leave to amend where complaint fails to allege facts to equitably estop defendants from asserting statute of frauds].)

Aegis also argues that it sufficiently alleged that the selling defendants were unjustly enriched, because it alleged that its participating in the bidding process generated leverage that helped CIM close the transaction with its preferred buyer.[9] But it cites no authority supporting the application

---

[9] This argument presupposes the elements of equitable estoppel: namely, a plaintiff "must allege that refusal to enforce the oral contract will result in (1) 'unconscionable injury' because the party pleading estoppel 'seriously . . . change[d] its position in reliance on the [oral] contract,' or (2) the 'unjust enrichment' of the party pleading the statute of frauds as a

of equitable estoppel in these circumstances. In its appeal from the judgment concerning CBRE, it cites no law whatsoever for that proposition. And in its appeal from the judgment relating to CIM, the only authority it cites is a federal district court opinion addressing recoverable damages for fraud under Tennessee law, not equitable estoppel. (*Vanderbilt University v. Scholastic, Inc.* (M.D. Tenn. 2019) 382 F.Supp.3d 734, 765 [noting that university's damages from professor's fraud in connection with commercial exploitation of university's intellectual property "could include lost royalties, negotiating leverage, market intelligence, and market share"].)

Furthermore, CIM argues, supported by case law, that Aegis' claim that the sellers were unjustly enriched is impossible to square with its allegation that Aegis would have submitted a higher bid than the buyer. Aegis does not respond to that contention, and we agree with it. (See *Smyth*, *supra*, 31 Cal.App.5th at p. 199 [order sustaining demurrer affirmed; allegation landlord was unjustly enriched by refusing to honor tenants' right of first refusal to purchase the property was "impossible to square with their allegation that their offer to buy the Property was the better offer, which means [landlord] was *harmed* by her failure to honor the alleged . . . contract that would have obligated her to consider the allegedly better offer"].)

In sum, Aegis has not demonstrated the trial court erred in rejecting its equitable estoppel argument.

---

defense because that party 'receiv[ed] the benefits of the other's performance.'" (*Smyth*, *supra*, 31 Cal.App.5th at p. 198.)

### III.
### *Intentional Interference With Contract Claim Against Bell Sound (Eighth Cause of Action)*

In light of our conclusion that the Third Amended Complaint fails to allege the existence of an enforceable contract, we also conclude the court did not err in sustaining Bell Sound's demurrer to the eighth cause of action alleging that it intentionally interfered with Aegis' contractual relations. This was the only substantive claim pled against Bell Sound, apart from various ancillary causes of action that Aegis pled against all defendants, discussed in Part IV, *post*.

As Aegis acknowledges, the contractual interference claim is premised on the existence of an allegedly "valid and existing contract" concerning competitive bidding. Aegis also acknowledges, citing authority, that the claim is not viable without an enforceable contract. (See *Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square Venture Partners* (1997) 52 Cal.App.4th 867, 877-880; *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 604, 606, disapproved on other grounds, *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1159, fn. 11.) Thus, as Bell Sound argues, Aegis' failure to plead the existence of any enforceable contract bars this claim.

### IV.

### *Promissory Estoppel (Fifth Cause of Action)*

Aegis has adequately stated a claim for promissory estoppel against both CIM and CBRE (fifth cause of action).

"In California, under the doctrine of promissory estoppel, 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such

action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.' " (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transp. Authority* (2000) 23 Cal.4th 305, 310 (*Kajima/Ray Wilson*).)  The elements of promissory estoppel have variously been stated as requiring:  "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) his reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." (*Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 890.)

A promise to award a contract through a competitive bidding process can give rise to promissory estoppel.  Aegis cites *Swinerton & Walberg Co. v. City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98, which held that the plaintiff adequately pled such a claim where the complaint alleged the defendant, a public agency, solicited competitive bids for a public works project but awarded the contract to the second lowest bidder rather than to the plaintiff, who was the lowest bidder. (*Id.* at pp. 101, 104, 105.)  Among other damages, plaintiff sought to recover the costs it had incurred in participating in the process.  (*Id.* at p. 103.)  Reversing an order sustaining a demurrer and holding the plaintiff alleged facts sufficient to state a claim, *Swinerton* reasoned that "[c]learly, the [defendant] promised in its solicitation of bids to award the contract to the lowest responsible bidder and [plaintiff's] reasonable and detrimental reliance upon this promise" satisfied the elements of promissory estoppel. (*Id.* at p. 104.)  It then examined an issue not pertinent here, which is whether the public nature of the contract rendered the doctrine inapplicable

on the facts alleged and concluded it did not.[10]  (See *id.* at pp. 104-105.)
*Swinerton* refrained from deciding the proper measure of damages, noting
that the question was a factual one for trial depending on the court's
consideration of "what is just under all of the circumstances."  (*Id.* at p. 105.)

   *Swinerton* was distinguished by *Universal By-Products, Inc. v. City of
Modesto* (1974) 43 Cal.App.3d 145 (*Universal By-Products*), cited by CIM and
CBRE, which affirmed an order sustaining a demurrer to a promissory
estoppel claim against a public entity in slightly different circumstances.
Like *Swinerton*, the public entity put a contract out to bid and expressly
reserved the right to reject all bids, but then rejected all the bids it had
received and instead engaged in negotiations with a third party.  (See
*Universal By-Products,* at pp. 149-150.)  The appellate court held the
complaint failed to allege the existence of promise upon which the plaintiff
could justifiably rely, because "such a promise would fly in the face of
[defendant's] express right to reject the bids."  (*Id.* at p. 156.)  It observed that
in these circumstances there was "no injustice in requiring [plaintiff] to bear
the expense of preparing its bid; it entered into the bidding procedure with
full knowledge of [defendant's] right to reject the bids if it should choose to do
so.  As an experienced business entity, [plaintiff] must be deemed to have
assumed the risk that [defendant] might act in accordance with its legal
right; such a risk is a cost of seeking to do business with a governmental
body."  (*Id.* at p. 157; contra, *Swinerton, supra,* 40 Cal.App.3d at pp. 104-105
[express reservation of rights to reject all bids does not defeat promissory

---

[10]  Public works contracts are "a unique species of commercial dealings"
involving "highly regulated circumstances" in which public entities, by
statute, retain broad discretion to reject all bids.  (*Roy Allan Slurry Seal, Inc.
v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 509, 510.)

estoppel claim; such a rule "would make the [defendant's] promise an illusory one and render the whole competitive bidding process nugatory"].) It distinguished *Swinerton* as involving "a promise to award a contract to the low bidder where the agency misawards the contract to a higher bidder" whereas the present case involved "a promise to consider the bids before reject[ing]" all of them, which was inconsistent with an express reservation of the right to do exactly that. (*Universal By-Products,* at p. 157.)

*Swinerton* remains good law. As explained by our Supreme Court: "[W]hen a public entity solicits bids, it represents, consistent with the statutory mandate, that if the contract is awarded, it will be awarded to the lowest responsible bidder. In reliance on this representation or requirement, a bidder incurs costs . . . preparing and submitting a bid. If its bid is the lowest, and it is a responsible bidder, but the contract is awarded to a higher bidder, the elements of a promissory estoppel cause of action appear to be established." (*Kajima/Ray Wilson, supra,* 23 Cal.4th at p. 315; see also *id.* at pp. 311-312 [discussing *Swinerton* and *Universal By-Products*].) A public entity's discretion to reject all bids and the public nature of the contract merely bear on the measure of damages available under a promissory estoppel theory. (See *Kajima/Ray Wilson,* at pp. 315-318 [lost profits not recoverable].)

Aegis argues that it adequately pled a claim for promissory estoppel under *Swinerton,* because the failure to abide by rules for a competitive bidding process gives rise to the aggrieved party's right to recover damages for the expenses it incurred in its fruitless participation in the bidding process. (See *Swinerton*, *supra,* 40 Cal.App.3d at p. 105.) We agree, and none of CIM's or CBRE's arguments persuade us otherwise.

24

CIM argues *Swinerton* is distinguishable because the defendant's promise to award its contract to the lowest bidder was expressly required by statute and local law. That distinction is immaterial. Promissory estoppel applies equally to private parties. (See, e.g., *Drennan v. Star Paving Co.* (1958) 51 Cal.2d 409, 413-415 [private subcontractor's low bid held a promise upon which private contractor could justifiably rely].) Further, whether a defendant is legally required to make a promise has no logical bearing on its enforceability. All that matters is whether the promise induced reasonable reliance and injustice would result if it were not honored.

We also do not agree with CIM's and CBRE's contentions that Aegis fails to allege a promise that is sufficiently clear. " 'To be enforceable, a promise need only be " 'definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages.' " ' " (*Aceves v. U.S. Bank, N.A.* (2011) 192 Cal.App.4th 218, 226 (*Aceves*).) Here, Aegis alleged a clear and unambiguous promise. It alleges CIM promised to sell the property through a competitive bidding process but then accepted an offer before the bidding deadline closed, thereby breaking its promise. (See *ibid.* [error to sustain demurrer where lender broke promise to negotiate terms of a loan modification].) There is nothing vague about that promise that would render it difficult or irrational to calculate Aegis' reliance damages; it seeks only to recover the costs it expended to prepare a bid that ultimately was preempted and pointless.[11]

---

[11] CIM also asserts the promise is fatally uncertain because there are no allegations it "would necessarily award the contract to [Aegis]." This misconceives the promissory estoppel claim. It is not based on a promise that CIM *would* sell the property to Aegis but on a promise to undertake a *specific*

In arguing the alleged promise is not sufficiently clear, both CIM and CBRE focus on allegations addressing how bids were to be narrowed down once the bidding got underway, which the complaint alleges could require the exercise of some discretion. They assert this discretion brings this case within the holding of *Universal By-Products*. But in *Universal By-Products*, the promissory estoppel claim was not viable because the defendant had the legal right to reject all bids which contradicted an alleged promise to consider the bids; no such reservation of right is alleged here.

The alleged discretionary aspects of the alleged competitive bidding procedure in no way render CIM's alleged promise to sell the property through a competitive bidding process unclear. In support of their "discretion" arguments, the defendants cite paragraph 104(a) of the Third Amended Complaint which alleges, as an illustrative example of CBRE's alleged joint decision-making authority over the process, that "under the Oral Agreement, CBRE would participate jointly in narrowing down the process to include only the two parties who submitted the highest initial bids (i.e. the 'Final Two Bidders'). Although narrowing it down would be relatively straightforward (based on the bid amounts), . . . additional complicating factors could potentially arise (e.g., involving payment structure), which would require . . . the use of some discretion and/or decision-making functions. CBRE had joint authority to exercise the discretion and/or decision-making functions, along with CIM and DOES 11-30." As Aegis argues, whatever discretion this entailed in the initial round, CIM never exercised its right to compare various bids before narrowing the process down

*procedure* toward that possible outcome. (Cf. *Aceves v. U.S. Bank, N.A., supra*, 192 Cal.App.4th at p. 227.)

to two final bidders because CIM allegedly canceled the bidding process before Aegis even submitted a bid. The process never got underway. That was not true in *Universal By-Products*, where the defendant actually exercised its right to reject all bids after they were submitted. Whatever might have happened had CIM kept its promise to conduct competitive bidding is irrelevant to the existence of an enforceable promise to *entertain* all bids received by the specified deadline and to sell the property by means of that process.

Finally, both CIM and CBRE posit several reasons the complaint fails to allege reasonable reliance, none persuasive. CIM asserts the allegations are insufficient to allege reasonable reliance because the promise was never reduced to writing, but it cites no authority supporting that argument.

CIM also argues there could be no reasonable reliance because the alleged promise is at odds with the "default" rule that an invitation to bid does not create an enforceable contract (see, e.g., *Universal-By-Products, supra,* 43 Cal.App.3d at p. 155). Similarly, CBRE argues that Aegis' reliance was unreasonable as a matter of law because "an experienced real estate investor[] cannot reasonably rely upon a promise that the property seller will not deviate from a competitive bidding process." But neither party cites authority that reliance was unreasonable as a matter of law in these circumstances.[12] And, as just explained, *Swinerton* is to the contrary. Further, as Aegis asserts, " ' " 'Except in the rare case where the undisputed

___

[12] CBRE cites authority involving quite different facts that was disposed of not at the pleadings stage but on summary judgment. (See *Granadino v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 411, 418 [once lender informed borrowers it would resume foreclosure proceedings, borrowers "could no longer reasonably rely" on lender's earlier alleged promise to review loan and pause foreclosure proceedings].)

facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' " ' " (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 391 [fraud claim].)

CBRE also argues reliance was not reasonable because Aegis alleges it received the offering memorandum which "expressly admonished Aegis that it could not rely on the bidding process" and the Third Amended Complaint alleges Aegis received this. But CBRE does not show it raised this issue in support of the demurrer to the Third Amended Complaint; the only place in the record where the Offering Memorandum appears is attached to a declaration in support of a demurrer to an *earlier* pleading. Moreover, whatever disclaimers it contained, the Offering Memorandum's contents do not defeat reliance as a matter of law. The complaint alleges it was given to Aegis during the October 7 property tour, after Aegis had *already* incurred substantial expenses in reliance on the alleged promises of a competitive bidding process.

Finally, Aegis argues it adequately alleged this claim against CBRE as well as against CIM, even though CBRE was acting only as a broker in the transaction. It rests this argument on Civil Code section 2343, subdivision (3), which imposes liability on an agent to third parties for acts undertaken in the course of his agency "[w]hen his acts are wrongful in their nature." Aegis cites federal district court authority holding that a promissory estoppel claim against a disclosed agent is viable under this provision "[t]o the extent" the plaintiff states a viable claim for fraud based on the same theory. (*Alcon Entertainment, LLC v. Automobiles Peugeot SA* (C.D. Cal., July 7, 2020, No. CV19-00245-CJC (AFMx) 2020 WL 8365247, at p. *9; see also *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone* (2003) 107 Cal.App.4th 54, 68 [" 'when the agent commits a tort, such

28

as . . . fraud . . . . , then . . . the agent [is] subject to liability in a civil suit for such wrongful conduct' "].)

Aegis asserts *Alcon* is correct, there is no contrary legal authority, and that liability may be imposed against CBRE because of its fraudulent conduct.[13] CBRE does not dispute that *Alcon* reflects a correct application of California law and contends only that *Alcon* is not "relevant" because Aegis has not stated a viable fraud claim against it. We thus accept the parties' characterization of California law and assume without deciding that *Alcon* is correct. For the reasons below, we will conclude that a viable fraud claim has been alleged against CBRE. Accordingly, under *Alcon*, the complaint also sufficiently states a claim for promissory estoppel.

Because the Third Amended Complaint adequately alleges a cause of action for promissory estoppel against CIM and CBRE, the trial court erred in sustaining demurrers to the fifth cause of action.

## V.

### *Fraud (Second Cause of Action)*

We also conclude the court erred in sustaining CIM's and CBRE's demurrers to the second cause of action for fraud.

---

[13] We reject Aegis' alternative argument that CBRE may be held independently liable for promissory estoppel as a joint venturer, for which extended discussion is unnecessary. Aegis has not demonstrated it sufficiently alleged that CBRE agreed to share not only in profits but also losses of the contemplated transaction, which is essential to the formation of a joint venture. (*580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 15; see *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1105 [affirming order sustaining demurrer].)

Because we have held the complaint fails to allege the existence of an enforceable contract, we also reject Aegis' alternative theory that CBRE may be held liable for promissory estoppel on the ground it was a party to the contract.

"The elements of fraud are a misrepresentation, knowledge of its falsity, intent to defraud, justifiable reliance and resulting damage." (*Gil v. Bank of America, N.A.* (2006) 138 Cal.App.4th 1371, 1381.)

" 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).) "Thus, in a promissory fraud action, to sufficiently alleges [*sic*] defendant made a misrepresentation, the complaint must allege (1) the defendant made a representation of intent to perform some future action, i.e., the defendant made a promise, and (2) the defendant did not really have that intent at the time that the promise was made, i.e., the promise was false." (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1060 (*Beckwith*).)

"[T]he policy of liberal construction of the pleadings does not apply to fraud causes of action. 'In California, fraud must be pled specifically; general and conclusory allegations do not suffice.' " (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 989; accord, *Gil v. Bank of America, N.A., supra*, at p. 1381.) " 'This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar, supra*, 12 Cal.4th at p. 645.)

Here, Aegis argues it adequately pled a cause of action for fraud against CIM and CBRE under *Universal By-Products*. There, although a promissory estoppel claim was rejected, the appellate court held the complaint adequately pled a claim for fraud based on a public entity's allegedly fraudulent promise to conduct competitive bidding. (See *Universal By-Products, supra,* 43 Cal.App.3d at pp. 151-153.)

30

We agree with Aegis that this case is controlling. In holding the allegations sufficient, *Universal By-Products* explained that "[t]he gravamen" of the cause of action was that the defendant "impliedly represented that it would consider the bids in good faith and not merely to gain the benefit of appellant's research and expertise, that this implied representation was false in that respondent never intended to award the license and that appellant justifiably relied on the misrepresentation to its resulting damage." (*Universal By-Products, supra,* 43 Cal.App.3d at p. 151.) Applying the principles of promissory fraud, it held the allegations "stated a cause of action for deceit in that it alleges that respondent falsely represented that it intended, at the time it solicited the bids, to consider them in good faith." (*Id.* at p. 153.) The same is true here, with the exception that the misrepresentation in that case was written (implied from the contents of a public "notice to bid" (see *id.* at p. 152)) whereas here it was allegedly oral.

Neither CIM nor CBRE meaningfully discuss or distinguish this authority. In a footnote, CIM points out that *Universal By-Products* affirmed an order sustaining a demurrer to the fraud claim. But the appellate court did so on the basis of governmental immunity, not failure to allege fraud. (See *Universal By-Products, supra,* 43 Cal.App.3d at pp. 153-155.) Indeed, *Universal By-Products* expressly held the plaintiff had adequately alleged fraud. (See *id.* at p. 153 ["we hold that apart from the question of governmental immunity, [plaintiff] has stated a cause of action for deceit in that it alleges that respondent falsely represented that it intended, at the time it solicited the bids, to consider them in good faith"].) CBRE invokes a portion of the opinion addressing the defendant's reservation of the right to reject bids (discussed *ante*), but no such right is involved here. Aegis thus

31

has demonstrated that it adequately pled a claim for promissory fraud under *Universal By-Products*.

Both CIM and CBRE nonetheless challenge the sufficiency of Aegis' allegations concerning virtually every element of such a claim. We reject their arguments.

*Misrepresentations*. Both CIM and CBRE assert that the only *specific* allegation of a factual misrepresentation upon which Aegis allegedly relied was that Aegis would be entitled to submit a bid until the close of bidding at 5:00 p.m. on Thursday, October 10, 2019. CIM asserts that the factual representations concerning an intent to conduct competitive bidding are not pled with sufficient particularity. It argues the complaint fails to allege when the oral conversations about that subject took place or "what specifically was said." For its part, CBRE asserts that Aegis fails to allege that *it* made any misrepresentations because there are no allegations that CBRE ever refused to accept a bid from Aegis.

We do not agree. These arguments rest on an overly cramped reading of the complaint, which must be read " 'as a whole' " and given a " 'reasonable interpretation.' " (*290 Division (EAT), supra,* 86 Cal.App.5th at p. 450.)

According to the *specific* factual allegations of the Third Amended Complaint, "[o]n or about September 24, 2019," "CBRE informed [Grant] Lammersen," an individual affiliated with Newmark Knight Frank who is Aegis' broker and real estate advisor, "that the Property would be sold through a competitive bidding process" and sent Lammersen an investment summary for the property. "On or about" the same date, Lammersen forwarded the Investment Summary to Aegis' president, Patrick Hotung.

Aegis also cites paragraphs 28, 31 and 32 of the Third Amended Complaint, which allege that it was CBRE's Executive Vice President Mike

32

Taquino who made the oral representations during phone calls to Lammersen and another NKF executive. Those paragraphs continue:

"[O]ver the ensuing two weeks, . . . Lammersen and NFK's Executive Managing Director Mike Brown were in frequent contact with Mr. Taquino—and with Plaintiff's President (Mr. Hotung)—by email and telephone. In the course of those interactions, Mr. Taquino informed NFK's Mr. Lammersen and Mr. Brown that the Property's owner (i.e., an investment fund formed and managed by CIM) had decided to solicit competitive written bids from prospective buyers and to close the bidding at 5:00 P.M. on Thursday, October 19, 2019. On behalf of CBRE (and CIM . . . ), Mr. Taquino solicited a bid from Plaintiff."

It also alleges that "[i]n oral communications in late September 2019 and the beginning of October 2019, CBRE . . . discussed with Plaintiff (through Plaintiff's agent Mike Brown of NKF) terms of a competitive bidding process . . . ." The terms allegedly discussed included all the terms of the oral agreement that was allegedly reached, which we have already summarized. The complaint alleges that "'The Competitive Bidding Process' terms were set forth by CBRE's Mike Taquino in oral communications with Plaintiff's agent Mike Brown of NKF in telephone conversations in the time period between September 24, 2019 and October 5, 2019." It alleges that Taquino "orally offered and proposed" those terms and Brown "orally accepted" them.

The complaint alleges that "[i]n reasonable reliance on Mr. Taquino's representations and the terms of the parties' Oral Agreement (including the Competitive Bidding Process term), [Aegis] expended substantial time and resources evaluating the Property and preparing an initial bid—under the time pressure that had been imposed by the above-referenced initial-bid-submission deadline," including travel expenses incurred by its executives

33

who flew (in the case of its President, from Buffalo, New York) to San Francisco.

These factual allegations were sufficient to " ' "show how, when, where, to whom, and by what means the representations were tendered." ' " (*Lazar, supra,* 12 Cal.4th at p. 645; see *id.* at p. 639 [holding complaint adequately alleged promissory fraud].)  Giving the complaint a reasonable construction, these allegations indicate that CBRE's Taquino told Aegis' broker over the course of multiple telephone calls during the alleged time period that the property would be sold through a competitive bidding procedure and explained the specific bidding procedures that would be followed.  It also alleges Aegis agreed to take part in the bidding subject to those terms.

Yet these representations were allegedly false:  CIM allegedly accepted an offer from Bell Sound the day before the bidding deadline.  The acceptance of another offer rendered the promise false regardless of whether Aegis was ever notified of this fact before the bidding deadline.  Furthermore, we cannot accept CBRE's illogical interpretation of the October 9 email (which advised Aegis that CIM had accepted Bell Sound's deposit) as *not* canceling the bidding, at least at this stage of proceedings.  Aegis argues the email "could not possibly be interpreted as leaving the bidding process in place," because "[o]bviously, a seller could not accept deposits from multiple buyers."  On review of the court's demurrer ruling, it is enough to say the email could reasonably be interpreted as cancelling the bidding, which is the interpretation we must give it.  (See *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 83 ["if the [complaint's] exhibits are ambiguous and can be construed in the manner suggested by plaintiff, then we must accept the construction offered by plaintiff"].)

34

*Knowledge of Falsity and Fraudulent Intent.* CIM argues the complaint fails to allege anything suggesting it knew CBRE's alleged representations were false when made. Relatedly, it argues that Aegis failed to allege facts demonstrating fraudulent intent, asserting that "the intent to defraud by a false promise cannot be established solely by non-performance." CBRE likewise contends the complaint fails to allege specific facts indicating *it* knew the promise of competitive bidding was false.

In a promissory fraud cause, knowledge of falsity and intent not to perform a promise are essentially the same. By sufficiently pleading that a promise is false at the time it is made, a plaintiff also sufficiently alleges the scienter element. (See *Beckwith*, *supra*, 205 Cal.App.4th at p. 1060 [holding allegations sufficient].) Here, Aegis did so.

Paragraph 88 alleges: "The above promises, representations, warranties and understandings, were false when made, and each of the Selling Defendants[14] knew them to be false when made. They were false when made, because (at the time they were made) Selling Defendants secretly intended to use the details of Plaintiff's interest in the Property as leverage to finalize a sale to the Purchasing Defendant(s)—without ever allowing Plaintiff to make an initial bid or honoring the other terms of the Competitive Bidding Process."

Paragraph 50 alleges: "at the time when Selling Defendants represented to Plaintiff that it would be entitled to participate in the Competitive Bidding Process, Selling Defendants intended otherwise and knew that their representation was false. Selling Defendants involved Plaintiff merely for the purpose of exerting greater leverage to close the deal

---

[14] "Selling Defendants" include CBRE.

35

(with the Purchasing Defendant(s)) by virtue of Selling Defendants' being able to credibly inform Purchasing Defendants that other investors (who possessed ample financial resources, sufficient to purchase the Property) were actively pursuing bidding on the Property."

These allegations were sufficient. "[I]n pleading a fraud action based on the alleged falsity of a representation or of a promise to perform a future act it is not necessary to allege the circumstantial evidence from which it may be inferred that the representation or promise was false—these are evidentiary matters which give rise to the misrepresentation. The only essential allegation is the general statement that the representation or promise was false and that the defendant knew it to be false at the time it was made." (*Universal By-Products*, *supra*, 43 Cal.App.3d at p. 151; accord, *Beckwith*, *supra*, 205 Cal.App.4th at p. 1060; see also 5 Witkin, Cal. Procedure (6th ed. 2023) Pleading, § 723, p. 144 ["Because knowledge is a fact, it is sufficiently pleaded by the general averment that the defendant knew that the representation was false, or that the falsity of the representation was known to the defendant"].) Likewise, "[i]ntent, like knowledge . . . is a fact. Hence, the averment that the representation was made with the intent to deceive the plaintiff, or any other general allegation with similar purport, is sufficient." (5 Witkin, *supra,* § 725 at p. 147.) These pleading rules exemplify the well-settled principle that " 'less specificity is required in pleading matters of which the defendant has superior knowledge' " including "matters such as a defendant's knowledge or notice or intent." (*Thomas v. Regents of University of California, supra,* 97 Cal.App.5th 587 [2023 WL 8248249, at p. *8]; accord, *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 549-550.)

36

Indeed, CIM cites California authority reflecting these principles. In *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, the complaint alleged only that the defendant didn't *intend* to abide by its promises (and did not) (*id.* at p. 476), and the appellate court said there was "no doubt" that it stated a cause of action for fraud (*id.* at p. 480).

CIM and CBRE cite one case suggesting a higher burden for pleading promissory fraud, *Reeder, supra,* 52 Cal.App.5th 795, which purports to require allegations of "facts or surrounding circumstances" reflecting an intent not to perform a promise and not just general allegations of fraudulent intent. (See *id.* at p. 804.)

Assuming without deciding *Reeder* is correct,[15] the Third Amended Complaint does allege facts or circumstances from which CIM's and CBRE's fraudulent intent can be inferred. The entire gist of Aegis' allegations is that the promises were made with the intent to deceive Aegis into expending time and money to evaluate the property and prepare a serious bid, so that it would serve CIM's duplicitous business purposes. As Aegis argues, it alleges facts demonstrating that CIM and CBRE *had a motive* to deceive Aegis in an effort to gain leverage in a sale to another buyer. It also alleges that at the time the promise was made, the secret buyer was concluding its own due diligence review. And it alleges the bidding process was cancelled with no explanation, *one day* before potentially higher bids might have been

---

[15] That aspect of *Reeder* is not a clear holding, insofar as the appellate court went on to rule on the basis of what it called a "[m]ore important[]" issue (i.e., lack of allegations showing justifiable reliance). (See *Reeder*, *supra*, 52 Cal.App.5th at p. 804.) Further, it rests on caselaw concerning the requirements of *proof* for a fraud claim, not its pleading requirements. (See *ibid.*, citing *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183.)

37

submitted.  From these allegations, it may be reasonably inferred that both CIM and CBRE, acting as its broker, *intended* to deceive Aegis.  *Reeder* involved no comparable allegations of any remotely similar surrounding circumstances.  The plaintiff just alleged that when he took out a home equity line of credit, the lender falsely promised him he would be able to refinance it when the balloon payment came due and ten years later reneged on the promise.  (See *Reeder*, *supra*, 52 Cal.App.5th at pp. 799, 803-804.)

*Justifiable reliance*.  CIM and CBRE both argue Aegis's reliance was not reasonable as matter of law because the representations were oral.  This argument borders on frivolous.  The authority they cite does not stand for that proposition.  Although the facts involved an oral promise, the holding had nothing to do with the oral nature of the alleged promise.  (See *Reeder*, *supra*, 52 Cal.App.5th at p. 804 [allegations that lender promised that borrower could refinance loan in 10 years held insufficient to state a fraud claim because "[i]t is patently unreasonable" to rely on such a promise "with no indication of what any of the terms of such a refinancing might be" because "innumerable factors pertinent to refinancing may change during a 10-year period—property value, equity in the property, income, and so on"].)  Under controlling Supreme Court authority, an allegedly false promise that is oral will support a claim for fraud even if the statute of frauds would bar its enforcement as a contract.[16]  (*Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 28-31 [fraud claim premised on oral promise to pay broker a commission].)  " ' "[T]he statute of frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding,

---

[16] *Pacific Southwest Development Corp. v. Western Pac. R. Co.* (1956) 47 Cal.2d 62, cited by CBRE, was not a fraud cause nor was it decided at the pleading stage but, rather, after a full trial on the merits.

protecting or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme." ' " (*Id.* at p. 30.)

## VI.

### *Remaining Causes of Action*

Finally, Aegis argues the court erred in sustaining demurrers to its five remaining causes of action. We reject its arguments.

The first cause of action, against CIM and CBRE, is for specific performance of the oral and/or implied competitive bidding contract. Because, as explained above, Aegis has failed to allege the existence of an enforceable contract, we affirm the dismissal of this cause of action. (See *Rossberg*, *supra*, 219 Cal.App.4th 1481, 1490-1491; *Mansouri v. Superior Court* (2010) 181 Cal.App.4th 633, 642 [specific performance requires existence of a contract and its breach].)

The seventh cause of action, against CIM and CBRE, is denominated one for "unjust enrichment/quantum meruit." Its allegations refer to a grab-bag of equitable principles including: restitution, constructive trust, unjust enrichment and "quasi contract or similar equitable doctrines." Aegis' only argument specifically directed to this cause of action (in the briefing on its appeal from CIM's judgment) fails to present a cognizable appellate argument that the court erred in sustaining a demurrer to this claim. Aegis makes no attempt to explain what the legal elements of this cause of action are or how its allegations satisfy those elements.

The ninth cause of action is for declaratory relief, asserted against all defendants. It alleges Aegis "has an interest under a contract (i.e., the Agreement) in submitting a bid in a Competitive Bidding Process to purchase the Property" and seeks a declaration of its rights to participate in the competitive bidding process "in conformity with the terms of the Agreement."

Because, as explained above, Aegis has failed to allege the existence of an enforceable contract, we affirm the dismissal of this cause of action. (See *Rossberg*, *supra*, 219 Cal.App.4th at pp. 1490-1491).

The tenth cause action seeks an injunction against all defendants to remedy their "unreasonabl[e] interfere[nce] with [Aegis's] opportunity to purchase the Property." The prayer for relief seeks an injunction preventing them from effectuating and recording any sale of the property without a competitive bidding process and/or setting aside any sale that has already occurred. Aegis fails to present a cognizable appellate argument that the court erred in sustaining a demurrer to this claim. Aegis makes no attempt to explain what the legal elements of this cause of action are or how its allegations satisfy those elements.

Nor has it demonstrated that injunctive relief is available as a *remedy* for either of the two causes of action it has adequately pled: promissory estoppel and fraud. Accordingly, it has not met its burden of persuading us that the complaint should be amended to alleviate any confusion as to whether it is seeking injunctive relief as a remedy for these claims, and thus we reject its argument it should be granted leave to do that.

Finally, the eleventh cause of action, brought against all defendants, is for constructive trust. It alleges the defendants, by virtue of their wrongful acts, are holding converted funds and/or real property as constructive trustees for Aegis' benefit. Aegis fails to present a cognizable appellate argument that the court erred in sustaining a demurrer to this cause of action. Aegis makes no attempt to explain what the legal elements of this cause of action are or how its allegations satisfy those elements.

For the first time in two of its three reply briefs, it asserts that imposition of a constructive trust may be imposed as a remedy for both

promissory estoppel and fraud and seeks leave to amend its complaint to so specify.

Aegis has not met its burden of demonstrating that either cause of action could be amended to pray for the imposition of a constructive trust. It cites *no* authority that a constructive trust may be imposed as a remedy for promissory estoppel.[17] And the authorities it cites for the proposition that a fraud claim "warrant[s] imposition of a constructive trust" do not stand for that broad, categorical proposition. They are based on the much narrower principle that "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, *unless he or she has some other and better right thereto*, an involuntary trustee of the thing gained, for the benefit of the person *who would otherwise have had it*. (Civ. Code, § 2224, italics added; see *Cramer v. Biddison* (1968) 257 Cal.App.2d 720, 724; *West v. Stainback* (1952) 108 Cal.App.2d 806, 817.) Aegis has not addressed this legal standard, much less demonstrated that it would be "otherwise entitled to" any property in the possession of the defendants under the circumstances alleged.

## DISPOSITION

The judgments entered in favor of CIM and CBRE are reversed. The judgment entered in favor of Bell Sound is affirmed. Appellant shall recover its appellate costs in A165331 and A165148. Respondent shall recover its appellate costs in A165153.

---

[17] In the authority it cites, monetary relief was awarded under *alternative* theories of promissory estoppel and constructive trust. (See *Signal Hill Aviation Co. v. Stroppe* (1979) 96 Cal.App.3d 627, 638-641; *Kajima/Ray Wilson*, *supra*, 23 Cal.4th at p. 321 [discussing *Signal*].)

_____
STEWART, P. J.

We concur.


_____
MILLER, J.



_____
MAYFIELD, J.*





*Aegis Asset Mgmt., LLC v. CBRE, Inc. et al.* (A165148, A165153, 165331)

_____

&ast; Judge of the Mendocino Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.